Reversed and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WIDENER joined. Judge MICHAEL wrote a dissenting opinion.
OPINION
WILKINSON, Chief Judge:
This case addresses whether defendant Eric Glover received constitutionally ineffective assistance of. The district court found that Glover had not proven actual prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It nevertheless granted a writ of habeas corpus to Glover under the perse prejudice reasoning of United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Because Strickland v. Washington’s actual prejudice analysis applies to this case, and because Glover cannot prove actual prejudice under the Strickland test, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.
I.
On June 19, 1991, a South Carolina jury found Eric Glover guilty of numerous counts resulting from the January 22, 1991 kidnapping and robbery of Wayne Cooper. Based on Cooper’s description of his assailant as well as other leads, police arrested Glover in Florida and returned him to South Carolina. A grand jury indicted him on five counts stemming from the January 22 incident — grand larceny, kidnapping, armed robbery, assault and battery with the intent to kill, and possession of a firearm during the commission of a violent crime.
Gordon Jenkinson, the public defender, originally represented Glover. Jenkinson met briefly with Glover at the March 1, 1991 preliminary hearing. Glover proclaimed his innocence, and later wrote Jen-kinson a letter with a list of potential alibi witnesses who would testify that Glover was in Florida on the date of the crime. Following this meeting, however, Jenkin-son resigned as public defender and his cases were reassigned.
The court ultimately assigned Glover’s case to Jerome Askins. Askins received Glover’s file on June 17, 1991. Glover’s trial was scheduled for the two week term of court beginning June 17. In addition to *272 Glover’s case, Askins was also responsible for “fifty or sixty” other assigned criminal cases during the term.
Askins first met with Glover on June 17. During this first meeting, Glover denied having committed the crimes. He again claimed he was in Florida during the robbery. Glover provided Askins with the names of approximately ten individuals whom he claimed would establish his alibi. Askins contacted some of these people, but determined that they would not provide any useful testimony. Askins said that he did not contact the other witnesses identified by Glover. Askins also reviewed Jen-kinson’s notes and talked to the investigating officer.
Glover’s trial was held on June 19, 1991. After the jury was selected, but before it was sworn and outside its presence, Askins moved for a continuance. He advised the court that he had been unable to identify any witness who could establish an alibi defense on behalf of Glover. The trial court denied the motion, stating that it could not subpoena witnesses from Florida and that it had no assurance that any witnesses would attend the trial if it were rescheduled. In reality, South Carolina law does allow criminal defendants to subpoena out-of-state witnesses.
During the trial, the State presented five witnesses. The first witness, Preston Wilson, testified that he owned a trailer which he rented to a tenant. On January 20, 1991, he went to the trailer where he conversed with an acquaintance of the tenant, Eric Glover. On cross-examination by Askins, Wilson admitted he had no personal knowledge about whether Glover committed any crime.
The next, most important, witness was the victim, Wayne Cooper. Cooper identified Glover as the ringleader in his kidnapping and robbery. According to Cooper, around 7:00 P.M. on January 22, he was driving his mother’s 1980 white Thunderbird. Cooper stopped in a grocery store where he struck up a conversation with a stranger. While on the stand, Cooper identified Glover as the person with whom he engaged in conversation.
According to Cooper’s testimony, Glover and Cooper then chatted about a variety of other matters, like the Super Bowl. Glover told Cooper that he was from Florida, and that he had just arrived in South Carolina. Glover and Cooper continued their conversation over drinks. While paying for the alcohol, Cooper opened his wallet. Cooper was carrying a little over $500. Cooper testified that Glover had an opportunity to observe the cash in Cooper’s wallet because Glover was standing beside Cooper during the purchase. Cooper and Glover then decided to visit some female friends of Glover’s. They drove to the women’s house in Cooper’s Thunderbird. Glover introduced Cooper to the women as his friend. After about twenty minutes at the house, Cooper wanted to leave. Cooper agreed to drop Glover off at the grocery store where they met.
Upon arriving, Cooper testified that Glover pulled a gun and told Cooper that this was a “stickup.” Glover forced Cooper into the backseat and repeatedly struck him in the face with the gun. At that point, two other people joined Glover. They drove off with Cooper and Glover still in the backseat. During the drive, Glover grabbed Cooper’s wallet. Glover continued to beat Cooper, thus preventing Cooper from seeing where he was being taken. Glover and his accomplices finally arrived at a dirt road. They pulled the car to the side of the road and checked to see if Cooper was still alive. After assuring themselves that he was indeed alive, they stuffed Cooper in the trunk and continued to drive.
*273 About five minutes later, the car stopped outside of a trailer. Glover and the two others moved Cooper from the trunk to the trailer. As Glover and his accomplices searched the Thunderbird, Cooper escaped through the back door. Cooper ran to a nearby trailer home, and was eventually taken to a hospital.
Askins vigorously cross-examined Cooper, questioning him on the time of the crime, the light outside when he observed Glover, the ease with which Glover could have killed Cooper, what Cooper was doing in the area, why Cooper could not identify the other two offenders even though he saw them, and other inconsistencies in his testimony.
The State then called Betty Lou Coker, the woman who lived in the other trailer home to which Cooper fled after he escaped. Coker testified that Cooper arrived at her mobile home around 8:30 P.M. According to Coker, Cooper said that he had just been beaten up, that his assailants had tried to kill him, and that they had taken his money. During cross-examination by Askins, Coker admitted that she had never seen Glover. Cooper’s father also testified for the State. He confirmed that Cooper was driving the 1980 white Thunderbird on January 22. Askins cross-examined Cooper’s father on a variety of matters, including why Cooper was in town that night and whether the father had any personal knowledge about the crime itself.
The State finally called Officer Debra Collins. Collins testified that she first saw Cooper in the hospital the night he was assaulted. According to Collins, Cooper told her that “this guy pulled a gun on him and made him get in the car against his will.” Cooper could not give the name of his assailant, but did provide a description of him. He said that his attacker was between 5'5" and 5'6", weighed between 140 and 150 pounds, had a light complexion, and walked slightly bowlegged. Cooper did not know the location of the trailer, except that it was down a dirt road.
Collins then told the jury that soon after conversing with Cooper, she received a call from another officer who had found a white Thunderbird at a trailer off a dirt road. Officer Collins went to the location and determined that the car was registered to Cooper’s mother. Collins also determined that Preston Wilson owned the trailer. Wilson told Collins that nobody was supposed to be in the trailer because the man renting it from him had already left town. Collins then entered the trailer, where she found a note written to “Dear Grandmother” and signed “Eric Glover.” Askins cross-examined Collins on a variety of issues.
After the State rested, Askins asked the judge for a directed verdict. Although the court denied the motion, it granted Askins’ motion to reduce the charge of grand larceny to use of a vehicle without the owner’s consent. Askins also consulted with his client and determined, after a lengthy discussion, that Glover did not want to testify. The defense did not call any witnesses. During his closing argument, As-kins pointed out the inconsistencies in Cooper’s testimony. He also noted that Cooper might be out to frame Glover. Asians argued that the only person who could say that Glover actually did anything illegal was Cooper himself. Askins maintained that Cooper might have been intoxicated or otherwise impaired that night. He also asked why Cooper could not remember Glover’s name the night of the crime. According to Askins, little things did not add up, and if the little things were wrong, the “big things” could be wrong as well. Twice before the verdict, the State offered Glover a plea. After consulting with Askins, Glover decided to reject the plea offer.
*274 The jury found Glover guilty on all charges, although it found that Glover committed the lesser included offense of assault and battery of a high and aggravated nature as opposed to the more serious charge of assault and battery with intent to kill. After the verdict, Askins renewed his motion for a directed verdict and appealed to the judge for leniency. Askins noted that Glover was only 18 at the time of the crime, that he had no prior criminal history, that he maintained his innocence throughout the trial, and that he had even rejected a plea agreement because he was not going to plead guilty to anything he did not do. The judge sentenced Glover to life in prison on the kidnapping charge, ten years consecutive on the armed robbery charge, and lesser concurrent sentences on the other charges.
After the South Carolina Supreme Court affirmed his conviction, Glover with a new attorney filed a motion for post-conviction relief in state court. Glover contended that his trial counsel was ineffective for failing to contact his alibi witnesses. At the hearing, Glover stated that he was in Florida at the time of the crime. Glover told the court that he had consistently maintained that he had been in Florida on January 22, and that he asked his previous attorney, Jenkinson, to contact his alibi witnesses. Glover stated that Willie Palmer could testify that he was in Florida on the night of January 22. Glover also identified at least eight other witnesses who could place him in Florida during the day of January 22. He testified that he gave all these names to his attorneys.
The only alibi witnesses who appeared in court, however, were Sandra Jordan and Sylvester Jordan. Sandra Jordan, Glover’s aunt, testified that she saw Glover in Florida at approximately 8:00 A.M. on January 22. Ms. Jordan named three other people who allegedly saw Glover during the day of the 22nd, none of whom were present at the hearing. Glover also called Sylvester Jordan, Glover’s grandfather. Mr. Jordan was asked on direct examination if Glover was in Florida when the crime took place. Mr. Jordan responded by stating, “He was in Florida when this took place as they say. I don’t know. And I don’t think he did what they say he did.” When asked by Glover’s lawyer for more information, Mr. Jordan repeatedly replied, “I don’t know nothing.”
The state court granted Glover’s motion for a new trial on ineffective assistance grounds. A divided South Carolina Supreme Court reversed, holding that Glover failed to establish a valid alibi defense at his post-conviction hearing and thus failed to show prejudice under Strickland v. Washington. See Glover v. South Carolina, 318 S.C. 496, 458 S.E.2d 538 (S.C.1995).
Glover then filed a petition for a writ of habeas corpus in federal court. The magistrate judge granted summary judgment for the State on three of Glover’s habeas claims, but permitted Glover to amend his Petition to add a fourth ground for relief regarding sentencing. State law at the time of sentencing set the maximum penalty for kidnapping at thirty years, not life. The state conceded error, and agreed with the limited grant of relief. On October 19, 2000, the district court granted the writ on Glover’s second claim — ineffective assistance of counsel. The district court noted but did not address the petition’s other three grounds for relief. South Carolina appeals.
II.
In Strickland v. Washington, 466 U.S. at 668, 104 S.Ct. 2052, the Supreme Court set forth a two-part test for deciding ineffective assistance of counsel claims. First, the defendant “must show that eoun- *275 sel’s performance was deficient.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To prove deficiency, a defendant “must show that counsel’s representation fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. Second, the defendant must show that the deficient performance resulted in actual prejudice to the defendant. A showing of prejudice requires the defendant to prove that “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Id. at 687, 104 S.Ct. 2052.
Strickland and its companion case United States v. Cronic, 466 U.S. at 648, 104 S.Ct. 2039, gave more specific instructions on finding prejudice. The Court stated that in certain limited contexts, “prejudice is presumed.” Strickland, 466 U.S. at 692, 104 S.Ct. 2052. In Cronic, the Court identified three distinct situations in which a presumption of prejudice is appropriate. First, prejudice is presumed when the defendant is completely denied counsel “at a critical stage of his trial.” Cronic, 466 U.S. at 659, 104 S.Ct. 2039. Second, per-se prejudice occurs if there has been a constructive denial of counsel. This happens when a lawyer “entirely fails to subject the prosecution’s case to meaningful adversarial testing,” thus making “the adversary process itself presumptively unreliable.” Id.
Third, the Court identified certain instances “when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.” Id. (citing Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). A finding of per-se prejudice under any of these three prongs is “an extremely high showing for a criminal defendant to make.” Brown v. French, 147 F.3d 307, 313 (4th Cir.1998).
Absent these narrow circumstances of presumed prejudice under Cronic, defendants must show actual prejudice under Strickland. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cronic, 466 U.S. at 666 and n. 41, 104 S.Ct. 2039. Actual prejudice requires the defendant to “show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Federal courts entertaining collateral attacks on state convictions have only limited powers of judicial review. See Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Bell v. Jarvis, 236 F.3d 149, 157 (4th Cir.2000) (en banc). Under 28 U.S.C. § 2254(d)(1), this court may not grant a writ of habeas corpus when a State court resolved the merits of a claim unless the adjudication of the claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1) (Supp. IV 1998).
In this case, Glover argues that the South Carolina Supreme Court’s decision was contrary to clearly established Federal law because it applied the actual prejudice standard of Strickland instead of the per-se prejudice analysis of Cronic and Powell v. Alabama, 287 U.S. at 45, 53 S.Ct. 55. In the alternative, Glover maintains that the South Carolina Supreme Court’s decision was an unreasonable application of clearly established Federal law because absent counsel’s errors, there is a reason *276 able probability that the jury would not have returned a verdict of guilty. We address each argument in turn.
III.
A.
Preliminarily, we may assume that Glover has satisfied the first prong of the Strickland analysis by showing “that counsel’s performance was deficient.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Cf. Glover v. South Carolina, 458 S.E.2d at 539-40 (assuming that counsel’s representation fell below an objective standard of reasonableness). In this case, Askins’ performance was not objectively reasonable. He failed to contact certain witnesses even though Glover provided him with names of potential alibi witnesses. He did not realize that a South Carolina statute allowed criminal defendants to compel the attendance of out-of-state witnesses necessary for the defense. Finally, Askins did not even realize that the sentence for kidnapping in South Carolina had been amended from a maximum sentence of life in prison to a maximum sentence of thirty years. Given these errors, combined with the fact that the State does not contest that As-kins’s performance was deficient, we may turn to the issue of prejudice.
B.
Glover contends that the South Carolina Supreme Court misapplied clearly established Federal law by employing an actual prejudice test instead of a per-se prejudice one. We disagree.
1.
The facts do not come close to fitting within the first of Cronic’s three criteria for per-se prejudice. Glover was not completely denied counsel at a critical stage of the proceedings. At all relevant times, he was represented by counsel. Jenkinson represented Glover at the preliminary hearing. Askins represented Glover from two days before trial through at least the post-trial motions and sentencing. A finding of per-se prejudice for complete denial of counsel requires at a minimum that no lawyer be present at a critical stage of the proceedings. See Roe v. Flores-Ortega, 528 U.S. 470, 483, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing Cronic, 466 U.S. at 659, 104 S.Ct. 2039). Here, Askins’ presence at counsel’s table mandates a finding that Glover was not actually denied the assistance of counsel.
2.
Second, Glover was not constructively denied the right to counsel. Askins did not “entirely fail[ ] to subject the prosecution’s case to meaningful adversarial testing” in such a way as to make “the adversary process itself unreliable.” Cronic, 466 U.S. at 659, 104 S.Ct. 2039. Askins acted as Glover’s advocate at every step. He contacted some potential witnesses. He asked for a continuance. He vigorously cross-examined witnesses. He questioned motives. He highlighted testimonial inconsistencies. He advised his client on possible plea deals. He pointed out the flaws of the State’s case to the jury. He made a vigorous closing statement. He asked the judge for a directed verdict both after the State’s case and after the jury verdict.
Furthermore, Askins was able to convince the judge to reduce one charge against Glover from grand larceny to possession of a vehicle without the owner’s consent. And he was able to convince the jury to find a verdict of assault and battery of a high and aggravated nature instead of assault and battery with intent to kill. Given these facts, we cannot say that Glover was constructively denied the right to *277 counsel. This case is not one where the lawyer literally sleeps through the State’s case or otherwise might as well be absent from the proceedings. Askins tested the State’s case at every juncture. He was an active advocate for Glover. Askins fulfilled his role as defense attorney by subjecting the State’s case against Glover to “the crucible of meaningful adversarial testing.” Id. at 656, 104 S.Ct. 2039.
It is true, as we have noted and as the State has conceded, that Askins failed Strickland’s test of objectively reasonable performance. But not every case of deficient performance under Strickland represents a constructive denial of the right to counsel. In fact, it will be the rare claim of ineffective assistance that is tantamount to a constructive denial of counsel. Strickland remains the norm for ineffective assistance claims, and the Supreme Court has made clear that it will not countenance a per-se prejudice exception which will swallow the actual prejudice Strickland rule. See, e.g., Roe, 528 U.S. at 483, 120 S.Ct. 1029; Perry v. Leeke, 832 F.2d 837, 842-43 (4th Cir.1987) (en banc).
If we were to broaden the per-se prejudice exception to Strickland, we would only add an extra layer of litigiousness to ineffective assistance law. To designate certain categories of cases as Cronic “constructive denial” cases and others as Strickland “deficient performance” cases would promote a new threshold area of debate and complicate the handling of this most common area of contention on collateral review. For that reason perhaps, the Supreme Court refused to apply a rule of per-se prejudice in Cronic itself. Ineffective assistance is not the same thing as an absence of assistance. Because Askins served as an advocate for Glover and tested the State’s case through the adversarial system, Glover cannot show that he was constructively denied his right to counsel.
3.
The third reason for finding perse prejudice is if “the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.” Cronic, 466 U.S. at 659-60, 104 S.Ct. 2039. Since 1984, the time the Court articulated the tests for actual and per-se prejudice in Strickland and Cronic, it has never once found per-se prejudice under this third prong of Cronic.
In Cronic, the Supreme Court confronted the issue of a young real-estate lawyer who was allowed only 25 days of pretrial preparation in a complex mail fraud case. See Cronic, 466 U.S. at 649, 104 S.Ct. 2039. The Court held that despite a limited time to investigate and prepare the case, the limited experience of counsel, the gravity of the charge, the complexity of possible defenses, and the limited accessibility of witnesses to counsel, a per-se rule of prejudice was not appropriate. See id. at 652, 663, 104 S.Ct. 2039.
Glover can point to only one case, Poioell v. Alabama, in which the Court has found a presumption of ineffectiveness based on the circumstances surrounding the defendant’s representation. See Powell, 287 U.S. at 45, 53 S.Ct. 55. Powell, decided in 1932, involved the infamous trial of several African-American men who faced the death penalty for raping a white woman on a train in Alabama. See Powell, 287 U.S. at 49-50, 53 S.Ct. 55. The defendants in Powell were not asked “whether they had, or were able to employ, counsel, or wished to have counsel appointed.” Id. at 52, 53 S.Ct. 55. Instead, the court appointed “ ‘all the members of the bar’ ” as counsel for purposes of arraignment. Id. at 56, 53 S.Ct. 55; accord Cronic, 466 U.S. at 660, 104 S.Ct. 2039. On the day of the trial six *278 days later, a lawyer from another state appeared, “but stated that he had not had an opportunity to prepare the ease or to familiarize himself with local procedure.” Cronic, 466 U.S. at 660, 104 S.Ct. 2039. The court thus decided that the out-of-state lawyer would represent the defendants “with whatever help the local bar could provide.” Id.
The Powell court recognized that the defendants in that case could not have received the assistance of counsel given the circumstances of the case. “The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them.” Powell, 287 U.S. at 57-58, 53 S.Ct. 55.
The circumstances of this case are nowhere close to Powell. Glover attempts to rely on the limited contact that he had with his first attorney, Jenkinson, the limited time that Askins had to prepare Glover’s ease and to investigate the potential alibi witnesses, the fifty or sixty other criminal cases for which Askins was responsible, and the severity of the crimes alleged in Glover’s indictment. These facts simply do not strip the trial of all its integrity so that a per-se rule of prejudice is justified without resort to an examination of the actual circumstances of the case.
Indeed, this court has already held that in a case involving similar facts, a finding of per-se prejudice was not appropriate. See Griffin v. Aiken, 775 F.2d 1226, 1229-30 (4th Cir.1985). In Griffin, the defendant argued that several factors justified a presumption of ineffectiveness. These included “minimal pre-indictment investigation by counsel,” “continuous presence of counsel in court on other matters in the three-day period between indictment and trial,” “limited time to talk with [the defendant] in the time period between the preliminary hearing and the morning of trial,” and “the inability of counsel appointed on the day before trial to present constitutional grounds for the suppression of evidence since counsel had no knowledge of the facts of’ the defendant’s case. Griffin, 775 F.2d at 1229. Furthermore, the defendant’s public defender had “between 100 and 140” other cases pending at the same time. Id. at 1230. Nevertheless, this court rejected the claim of per-se prejudice because “a review of the circumstances surrounding [the defendant’s] representation reveals to us that in the same circumstances it was not unreasonable to expect that a competent lawyer could render effective assistance of counsel.” Id. at 1230 (citing Cronic, 466 U.S. at 659-60, 104 S.Ct. 2039).
And this court has also held that counsel appointed the day after indictment and the day of trial does not justify a finding of per-se prejudice under Cronic. See Praylow v. Martin, 761 F.2d 179, 181-83 (4th Cir.1985). In Praylow, we stated that “late appointment of counsel” fails to justify “a presumption of ineffective assistance of counsel.” Id. at 183.
We fail to see any materially distinguishable facts between this case and Praylow and Griffin. Here, Askins was not appointed until two days before trial, but he was able to spend some time on the case. In Praylow, counsel was appointed on the same day as the trial. Here, As-kins had between fifty and sixty other cases, but counsel in Griffin had between 100 and 140 other cases. In Griffin, counsel spent hardly any time on the case and was in court on other matters continuously *279 in the three-day period between indictment and trial. This case, like Praylow and Griffin, more closely resembles the facts of Cronic than it does the facts in Powell v. Alabama.
Indeed, the Supreme Court has long emphasized that late appointment of counsel does not ipso facto trigger a rule of per-se prejudice. See Cronic, 466 U.S. at 661-62, 104 S.Ct. 2039. In Chambers v. Maroney, 399 U.S. 42, 53, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held that it would not presume prejudice where counsel appeared in the case only a few minutes before trial. The Court stated that it was “not disposed to fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel.” Id. at 54, 90 S.Ct. 1975. Thus reviewing courts must generally regard trials, especially state trials on federal collateral review, through a particularized and individualized lens rather than through some broad-brush presumption of prejudice. Courts should not presume prejudice where the facts show otherwise, and Strickland has the bedrock virtue of looking at prejudice to the defendant in each case. We do not think the South Carolina Supreme Court violated any clearly established law by applying the Strickland rule and thereby serving the goal of individualized adjudication. Having found that application of a per-se prejudice standard would be improper, we turn to the question of whether Glover • was actually prejudiced by Askins’ defense.
C.
Glover must show that Askins’ errors sufficiently undermined confidence in the jury’s verdict. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (There must be “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”). Glover maintains that the testimony of Sandra Jordan and Sylvester Jordan at the state post-conviction hearing creates a “reasonable probability that the result of the proceeding would have been different.” Id. Like the district court, we disagree.
To begin with, the State presented strong evidence as to Glover’s guilt. Wayne Cooper, the victim, testified how he spent over an hour with Glover, how they talked about a variety of things, how they went to meet friends of Glover’s; and how Glover robbed, beat, and kidnapped him. The State was not presenting a victim who had a fleeting and transient exposure to the defendant. Cooper had more than ample opportunity to determine precisely how the defendant looked, and he recounted Glover’s appearance to the police at the first opportunity. Furthermore, the State established that Cooper’s car was found in front of the Wilson trailer, where Glover had recently been seen. The State also presented the testimony of Betty Lou Coker, who stated that a badly beaten Cooper did indeed arrive at her trailer, which was located near the Wilson trailer, on the night of January 22.
After the jury verdict against Glover and the South Carolina Supreme Court’s affirmance of it, the State gave Glover another opportunity to present evidence of his innocence at the post-conviction proceeding. At that hearing, Glover was ably represented by counsel. Without any time constraints to produce witnesses, Glover could present only his aunt, Sandra Jordan, and his grandfather, Sylvester Jordan. Neither could testify that Glover was in Florida at the time of the crime. Sylvester Jordan could state only that “He was in Florida when this took place as they say. I don’t know. And I don’t think *280 he did what they say he did.” When pressed for more information about Glover’s whereabouts on the night of January 22, Mr. Jordan could state only, “I don’t know nothing.”
Sandra Jordan could testify only that Glover was in Florida around 8:00 A.M. on the morning of January 22, leaving ample time for Glover to arrive in South Carolina by that evening. As the South Carolina Supreme Court stated, “Ms. Jordan’s testimony merely placed [Glover] in Florida between 8:00 and 8:30 a.m. on the date the crimes occurred. However, the crimes occurred in Williamsburg County over eleven hours later at approximately 8:30 p.m.” Glover, 458 S.E.2d at 540. Indeed, Ms. Jordan estimated that it took her about 6 hours to drive from Florida to South Carolina. And while both Sandra Jordan and Glover purported to identify other people who could support the claim that Glover was in Florida on January 22, none appeared at the hearing. The testimony of Glover (who chose not to testify at trial), and of Mr. and Ms. Jordan standing alone, does not create a reasonable probability of a different outcome. As the South Carolina Supreme Court noted, “[t]he failure to contact Sylvester or Sandra Jordan did not result in prejudice to [Glover] as neither witness’s [post-conviction hearing] testimony established an alibi defense.” Glover, 458 S.E.2d at 540.
Moreover, nothing has cast doubt on Cooper’s testimony. None of Glover’s witnesses could testify, for instance, that they saw Cooper with a different person on the 22nd. And they could not establish any reason why Cooper would be fabricating any part of his unfortunate experience that night. In short, the evidence at the post-conviction hearing failed to undermine confidence in the outcome of the trial. Indeed, although the district court granted the writ on the per-se prejudice rule of Cronic, it found that Glover could not show actual prejudice under Strickland. We agree with the district court on this point. Indeed, our fine dissenting brother makes no contention that this defendant is innocent of any of the crimes with which he was charged. The South Carolina Supreme Court’s finding of no actual prejudice was not an unreasonable application of clearly established Federal law.
IV.
It is a cardinal principle of criminal justice that federal courts must give state court convictions a significant measure of respect. In federal habeas cases, “deference to state-court findings is mandated by 28 U.S.C. § 2254(d).” Greene v. Georgia, 519 U.S. 145, 146, 117 S.Ct. 578, 136 L.Ed.2d 507 (1996) (per curiam); see also Williams, 529 U.S. at 410, 120 S.Ct. 1495. The South Carolina Supreme Court applied the landmark Strickland decision to Glover’s ineffective assistance of counsel claim and reasonably found an absence of actual prejudice to the defendant. The state court ruling on this point was a sound one, and a federal court has no basis for upsetting it. For the foregoing reasons, the judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.